**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DISTRICT**

_____

**CARMELO ALICEA, et al.,**

                    **Plaintiff(s),**          **CASE NUMBER: 03-74992**
                                        **HONORABLE VICTORIA A. ROBERTS**

**v.**

**THE CITY OF PONTIAC, et al.,**

                    **Defendant(s).**
_____/

<u>**ORDER**</u>

**I.      INTRODUCTION**

        This matter is before the Court on Defendants' Motion for Summary Judgment.

The Court **GRANTS** Defendants' motion in part and **DENIES** it in part.

**II.     BACKGROUND**

        This case arises from Plaintiff Carmelo Alicea's ("Alicea") arrest at the Puerto

Rican Festival in Pontiac, Michigan on July 13, 2002.  Alicea attended the festival with

two of his minor children, Plaintiffs Jonathan Rodriguez ("Jonathan") and Alexis Alicea

("Alexis"), as well as his girlfriend, Arcelia Cardona, and her three children.  Jonathan

and Alexis were 10 and 12 years old, respectively.  The festival was hosted on the roof

of the Phoenix Center in downtown Pontiac.  Beginning at approximately 8:30 p.m.,

multiple fights broke out and people began throwing items off the roof.  At approximately

9:30 p.m., Pontiac Police Sergeant Josephine Fagan ordered the festival closed and the

area evacuated.

1

Defendant Magdalena Martinez ("Martinez"), a detective with the Pontiac Police Department, was patrolling the roof during the melee. When the decision was made to end the festival, Martinez walked among the crowd ushering people out. She came upon Alicea and his party and asked them to leave. Alicea states that he responded by saying that he would leave, but that he was missing one of his kids, Alexis. He says that Martinez said that she did not care, insisted that he leave, and poked him with a flashlight while he was gathering his things and walking towards the exit.

When Martinez moved on, Alicea stopped to ask another patron if he had seen Alexis. Shortly thereafter, Martinez approached Alicea again. The parties dispute what occurred during the second encounter. Martinez says that she again ordered Alicea to leave, but that he opposed her order and became argumentative. Martinez says that she then threatened to place Alicea under arrest. At that time, Martinez testified that a woman that she later learned was Alicea's sister jumped on her back while Alicea grabbed her wrist and started twisting it. Per Martinez, Alicea's sister got away in the crowd. However, Defendants Michael Hergott ("Hergott"), a sergeant, and Officer Casey Crampton ("Crampton") came over to assist. At Martinez's direction, they attempted to place Alicea under arrest. Hergott and Crampton testified, however, that Alicea resisted their attempts to place his hands behind his back. They then forced him to the ground.

Alicea recalls the incident differently. He says that when Martinez approached the second time she began screaming at him and grabbed his shirt. Alicea says that he never touched Martinez. Rather, he says that when Martinez reached for his shirt he stepped back, which caused her hands to slip out of his shirt. Alicea says Martinez then

2

used her radio to call for assistance.  Immediately afterwards, he says that he was knocked to the ground from behind by several officers.  He did not see how many officers took him down.  But, Alicea says that he saw four or five Pontiac police officers, including Hergott and Crampton, standing around him while he was on the ground.  After he was handcuffed and while still face down on the ground, Alicea says that one or more officers kicked him.  Hergott and Crampton admit that they took Alicea to the ground, but Alicea is unable to say whether they were also among the officers who kicked him.

One of Alicea's sons, Jonathan, corroborates his version of events.  Jonathan witnessed his father's exchange with Martinez and testified that he saw Martinez grab Alicea's shirt.  He says Alicea responded by moving his shoulder back in an attempt to pull away from Martinez, but he could not see what, if anything, Alicea was doing with his hands during that time.  While Martinez was holding Alicea, Jonathan says he saw her hit Alicea in the eye with her flashlight and yell for help.  Thereafter, Jonathan says that at least ten officers ran over and some or all of them jumped on Alicea, kicked him, and attempted to arrest him.  At this point, Jonathan says that he ran and started to cry.  It was later determined that Alicea's other son, Alexis, was not on the roof when Alicea was arrested.  Alexis was downstairs during Alicea's arrest, and testified that he only saw Alicea after he was seated in a patrol car.

Alicea was charged with disorderly conduct, assaulting an officer, and resisting and obstructing an officer in the discharge of duties.[1]  These were all misdemeanor

---

[1]Per Defendants, the specific Pontiac Code sections Alicea was charged under are as follows:  §86-142(6)("A person shall be guilty of disorderly conduct if, with the

charges.  No preliminary examination or finding of probable cause was made.  Following

a jury trial, Alicea was acquitted of all charges.  Subsequently, on behalf of himself and

his minor children, Alicea filed this nine-count action against the City of Pontiac ("the

City"), Pontiac Police Chief Rollie Gackstetter ("Gackstetter"), and officers Martinez,

Hergott and Crampton.[2]  In addition to claims directly related to his altercation with the

officers, Alicea alleges that supervisory officials are also liable for the manner in which

the incident was handled afterwards.  Specifically, Alicea contends that the internal

investigation of the incident, which was conducted by Pontiac Police Lieutenant Brian

Flye ("Lt. Flye") was inadequate.  Alicea argues that Lt. Flye failed to interview all

necessary witnesses; that Lt. Flye was aware that Martinez violated department policy

by failing to prepare a report substantiating probable cause to arrest him; and, that Lt.

Flye and Chief Gackstetter were aware that Martinez allegedly used excessive force in

arresting another festival patron at the same event.  Nevertheless, Alicea asserts that

Lt. Flye and Chief Gackstetter "rubber-stamped" Martinez's decision to arrest him, which

he contends was clearly without probable cause.

Alicea alleges on his own behalf: false arrest (Count I); false imprisonment

---

intent to cause public inconvenience, annoyance, alarm, or recklessly creating the risk
thereof, he causes, provokes or engages in any fight, brawl or riotous conduct so as to
endanger the life, limb, health or property of another."); §26-32 ("No person shall assault
or attack any police officer or firefighter while in the performance of his duties."); and,
§86-31 ("No person shall knowingly or willfully obstruct, hinder, resist or oppose any
police officer or firefighter while discharging or attempting to discharge his duties.").
Def. br. at pp. 3-4.

[2]Alicea also named the Pontiac Police Department as a party Defendant.
However, in his response brief, he concedes that the PPD is not a proper party and that
it should be dismissed.

4

(Count II); malicious prosecution (Count III); assault and battery (Count IV); gross negligence (Count V); intentional infliction of emotional distress ("IIED")(Count VI); and, multiple violations of 42 U.S.C. §1983 and the Michigan Constitution (Counts VII and VIII). On behalf of Jonathan and Alexis, Alicea alleges negligent infliction of emotional distress ("NIED")(Count IX). Defendants move for summary judgment on all claims.

## III.   STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995). To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox*, 53 F.3d at 149. Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for

5

discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact.  Rule 56(e); *Cox*, 53 F.3d at 150.  The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint.  *Copeland*, 57 F.3d at 479.  "The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party."  *Id; See also Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## IV.    APPLICABLE LAW AND ANALYSIS

As a preliminary matter, both parties vacillate between referring to "Plaintiff" in the singular and "Plaintiffs" collectively in discussion of each claim.  However, it is apparent that the only claim brought on behalf of Jonathan and Alexis is Count IX for NIED.  The remaining claims are brought by Alicea alone and, therefore, will be addressed accordingly.

### A.    FEDERAL CLAIMS

Alicea alleges that he was deprived of his Fourth Amendment rights, in violation of 42 U.S.C. §1983, when he was arrested without probable cause and the Defendant

6

officers used excessive force to carry out his arrest.[3]   Alicea specifically asserts that Defendants Martinez, Hergott and Crampton are directly liable, that Chief Gackstetter is liable in his supervisory capacity, and that the City of Pontiac is liable for its failure to train the Defendant officers.

### i.    Defendants Martinez, Hergott and Crampton

Defendants Martinez, Hergott and Crampton contend that Alicea has not presented any evidence that his constitutional rights were violated.  And, even if the Court finds that there is evidence of a constitutional violation, they argue that they are entitled to qualified immunity.

### a.    Constitutional Claims

A claim brought under 42 U.S.C. § 1983[4] "requires a showing that the plaintiff possessed a right; that he or she was deprived of that right; and that the deprivation was caused by the reckless or intentional conduct of a person acting under color of law."  *Ahlers v Schebil,* 994 F. Supp 856, 864 (E.D. Mich. 1998), *aff'd,* 188 F.3d 365 (6th Cir. 1999).  Injuries caused by mere negligence do not constitute a "deprivation" of a

---

[3]Alicea also alleges that Defendants violated his First, Fifth and Fourteenth Amendment rights and the Michigan Constitution.  However, because he does not offer any argument in opposition to Defendants' motion for summary judgment on these claims, they will be dismissed.

[4]42 U.S.C. § 1983 states in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

7

constitutionally protected right.  *Id* (quoting *Lewellen v The Metropolitan Government of Nashville*, 34 F.3d 345, 348-349 (6th Cir. 1994), *cert. den.,* 513 U.S. 1112 (1995)).  The issue in this case is whether Alicea presented *prima facie* evidence that his Fourth Amendment rights were violated when, according to him, he was arrested without probable cause and the officers used excessive force.

A warrantless arrest does not violate the Fourth Amendment if, objectively, the officer has probable cause to believe that the suspect has committed or is committing a crime.  *Criss v City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988).  "The Supreme Court has defined 'probable cause' as the 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'"  *Id* (citing *Michigan v DeFillippo*, 443 U.S. 31, 36 (1979)).  Allegations regarding an alleged ulterior motive for the arrest are irrelevant if an objective assessment of the circumstances supports a finding of probable cause.  *Id.*  The question for the trial court on summary judgment is "whether the arresting officers were justified in their belief that plaintiff had probably committed or was committing a crime."  *Id.*  Where a finding of probable cause rests upon disputed questions of fact, summary judgment is inappropriate.  *Id*; *Gardenhire v Schubert*, 205 F.3d 303, 315 (6th Cir. 2000); *Ingram v City of Columbus*, 185 F.3d 579, 594 (6th Cir. 1999); *Ahlers,* 994 F.Supp. at 872-873.

Claims of excessive force by police officers must be analyzed under the Fourth Amendment and its "reasonableness" standard.  *Graham v Connor,* 490 U.S. 386, 395 (1989).  In *Graham*, the Court stated that "the right to make an arrest or investigatory

8

stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id* at 396.  Therefore, when analyzing such a claim the Court must consider: 1) the severity of the crime; 2) whether the suspect poses an immediate threat to the safety of officers or others; and 3) whether the suspect is actively resisting arrest or attempting to flee. *Id*.  The trial court must determine "whether the officers' alleged actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id* at 397.  Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id* at 396.  A plaintiff need not suffer serious or permanent injury to sustain a claim of excessive force *Johnson v City of Ecorse*, 137 F.Supp.2d 886, 892 (E.D. Mich. 2001)(plaintiff's complaint of injury to his wrist from tight handcuffs sufficient).   However, there must be more force than "than the mere technical battery that is inextricably a part of any arrest." *Id*.

There is a question of fact regarding whether Defendants Martinez, Hergott and Crampton violated Alicea's Fourth Amendment rights.  Alicea testified that, although he told Martinez that one of his children was missing, he agreed to leave and moved towards the exit.  On the way out, he says he stopped to ask another festival-goer if he had seen his son.  At that time, Alicea says Martinez approached a second time and began screaming and grabbing him.  Alicea's son, Jonathan, testified that he saw Martinez grab Alicea and hit him in the face with a flashlight.  Alicea denies grabbing or otherwise touching Martinez.  Nevertheless, Alicea says Martinez called for assistance and other officers responded by tackling him from behind and knocking him down, even though he says that he was behaving peaceably and did not resist arrest.  Hergott and

9

Crampton admit that they were the ones who forced him to the ground.

Assuming Alicea and Jonathan's testimony to be true, it evidences that Martinez initiated an unprovoked attack upon Alicea and ordered Alicea's arrest although no crime was committed or threatened; and, an unreasonable amount of force was exercised by Hergott and Crampton while trying to effect Alicea's arrest.  If the jury decides that the officers did not have probable cause to arrest Alicea and/or that excessive force was used, then the Court must decide whether a reasonable officer in Defendants' position could have failed to appreciate that Plaintiff's rights were violated by their conduct.

### b.    Qualified Immunity

Even though there is *prima facie* evidence that Alicea's constitutional rights were violated, Defendants Martinez, Hergott and Crampton contend that they are entitled to qualified immunity as a matter of law.  The Court disagrees.   Even when a constitutional right has been infringed, government officials who perform discretionary functions are generally entitled to qualified immunity and are protected from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In other words, qualified immunity is appropriate either on the basis that the right allegedly violated was not at the time "clearly established," or if "clearly established," was one that a "reasonable" person in the defendant's position could have failed to appreciate would be violated by his conduct. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The court must employ a standard of objective reasonableness and analyze

10

claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the officer's position could have believed that his or her conduct was lawful, in light of clearly established law and the information he possessed. *Id*; *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir.1994) ( "[T]he question is whether any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.") (*quoting Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir.1989)).

The ultimate burden rests with plaintiff to show that the defendant is not entitled to qualified immunity. *Gardenhire*, 205 F.3d at 311. However, "[t]he defendant bears the initial burden of coming forward with facts to suggest that he acted within the scope of his discretionary authority during the incident in question." *Id*. Thereafter, the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct." *Id*.

Whether a Defendant is entitled to qualified immunity is usually a question of law for the court to decide. *Brandenburg*, 882 F.2d at 215. However, when the relevant facts are in dispute, the court must leave the factual findings to the trier of fact:

> [S]ummary judgment would not be appropriate if there is a factual dispute (i.e., a genuine issue of material fact) involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.

*Gardenhire*, 205 F.3d at 311. See also *Adams,* 31 F.3d at 387 ("[T]he jury becomes the final arbiter of [defendant's] claim of immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury.").

11

The first prong of the Court's analysis is satisfied because the Fourth Amendment right to be free from unreasonable seizures and from the use of excessive force is clearly established.  *Adams*, 31 F3d at 386; *Johnson,* 137 F.Supp.2d at 893. However, facts relevant to the second prong--whether a reasonable officer in Defendants' position would have known that their alleged actions violated clearly established rights--are in dispute.  As described above, Alicea and the officers give very distinct accounts of what happened.  Therefore, until the trier of fact determines what Defendants' alleged actions were, the Court cannot make a legal determination regarding qualified immunity.  Summary judgment on this claim is denied.

> ## ii.    Defendant Gackstetter

Alicea claims that he cannot adequately respond to Chief Gackstetter's motion on this claim because he does not have sufficient discovery to fully adjudicate the issue of supervisory liability.  However, Defendants point out that discovery was open for approximately 11 months.  During that time, Alicea did not file any motions or otherwise seek intervention of the Court regarding discovery.  Therefore, Plaintiff's claim is untimely and is disregarded.

Turning to the merits, a claim under §1983 against a supervisor for the actions of those in his employ can only be maintained with proof that the supervisor "did more than play a passive role in the alleged violation or showed mere tacit approval of the events." *Bass v Robinson,* 167 F.3d 1041, 1048 (6th Cir.  1999).  Supervisory liability must be based on active unconstitutional behavior, rather than a mere failure to act, a right to control employees, or simple negligence.  *Id*; *Bellamy v Bradley,* 729 F.2d 416, 421 (6th Cir. 1984), *cert. den.,* 469 U.S. 845 (1984).  A plaintiff must demonstrate that "the

12

supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy,* 729 F.2d at 421; *Combs v Wilkinson,* 315 F.3d 548, 558 (6th Cir. 2002). At a minimum, there must be evidence that the supervisor either engaged in active unconstitutional behavior or implicitly authorized, approved, encouraged, condoned or knowingly acquiesced to the actions of someone in his employ. *Bellamy*, 729 F.2d at 421.

The precise basis of Plaintiff's claim against Chief Gackstetter is not entirely clear. Alicea seems to argue that Chief Gackstetter is liable due to his alleged failure to conduct or oversee a thorough investigation of Alicea's claims, and his alleged failure to adequately supervise and/or discipline the officers in his command regarding use of force. The Court finds that Plaintiff's allegations are not sufficient to establish supervisory liability.

First, there is no evidence to support several of Plaintiff's assertions. Specifically, Plaintiff contends that Chief Gackstetter failed to "enforce unspecified departmental policies to ensure that he had the necessary information to supervise and discipline officers."   Pl. br. at 10.   The fatal flaw with this argument is that Plaintiff does not even identify the departmental policies that Gackstetter allegedly failed to enforce.

Plaintiff also asserts that Chief Gackstetter failed to "ensure that an adequate parallel investigation would be conducted, [since] he failed to enact policies requiring his subordinates to [thoroughly] investigate and interview all witnesses[,]" and that he failed to implement an internal system of checks and balances to detect police misconduct, which failure Plaintiff says was "the driving force behind the de facto policy maintained by the City of Pontiac that encouraged, tolerated and assisted in the use of excessive

13

force." Pl. br. at 10. But, Alicea has not presented any evidence that the necessary policy to ensure a thorough investigation of his incident was not in place, or that Gackstetter failed to implement an internal system of checks and balances to detect police misconduct. In fact, Defendants attached written procedures from the Pontiac Police--Manual of Procedures (eff. July 11, 2000), which outline procedures for reporting, investigating and addressing employee misconduct. Def. Exh. 9. Moreover, in addition to the fact that there is no proof of Plaintiff's claims, none of his allegations indicate that Chief Gackstetter encouraged, participated or acquiesced in the use of excessive force.

Second, there is no evidence to support Plaintiff's claim that Martinez was inadequately trained, supervised or disciplined. The documents Alicea relies upon to establish that complaints of excessive force were previously made against Martinez (between 1996 and 1998) only indicate that the complaints either are or were pending. See Pl. Exhs. L and O. One complaint (which was not an allegation of excessive force) was determined to be unfounded, and it is not clear that Martinez was, indeed, found to be culpable for the remaining complaints. *Id.*[5]

Lastly, even if Plaintiff is correct that Gackstetter failed to require Martinez to participate in annual use of force training, that fact alone suggests nothing more than negligence, which is insufficient to establish supervisory liability under §1983. *Bass,* 167 F.3d at 1048. Plaintiff's argument may be that a failure to require annual training

---

[5]The only documented finding of culpability Plaintiff provides is a reprimand Martinez received for improper use of force during the arrest of another festival patron on the same evening.

14

despite Martinez's disciplinary record is indicative of more than mere negligence and actually is tantamount to implicit acquiescence in Martinez's alleged behavior. Again, however, Plaintiff has not presented sufficient evidence of Martinez's disciplinary record. He only shows that, prior to this incident, complaints of excessive force were made. There is no evidence that any of the complaints were substantiated.

For these reasons, Chief Gackstetter's motion on this claim is granted.

### iii.    City of Pontiac

Plaintiff contends that the City of Pontiac is liable under 42 U.S.C. §1983 for its failure to properly train its officers with regard to the proper use of force during an arrest. "The Supreme Court has held that the 'inadequacy of police training may serve as the basis for §1983 liability,' but 'only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Cherrington v Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)(*quoting City of Canton v Harris*, 489 U.S. 378, 388 (1989)). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton,* 489 U.S. at 389. Stated another way, a policy or custom can be inferred when, considering the duties assigned to specific officers, "the need for more training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id* at 390. Once a policy or custom of inadequate training is established, however, liability will only attach if the inadequacy is closely related to or actually caused the plaintiff's injury. *Russo v City of*

15

*Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)(*quoting Hill v McIntyre,* 884 F.2d 271, 275 (6th Cir. 1989).

The *Cherrington* Court succinctly summarized a plaintiff's burden of proof for such claims:

> To be actionable, a municipality's training must be inadequate to the tasks that its officers must perform, this inadequacy must be the product of deliberate indifference, and this inadequacy must have been closely related to or have actually caused the plaintiff's injury.

344 F.3d at 646.  The *Cherrington* Court further stated that, under *City of Canton*, there are at least two situations where inadequate training can be found as a result of deliberate indifference: 1) when there is a failure to adequately train in light of foreseeable consequences that could result from lack of instruction, and 2) when a city fails to act in response to repeated complaints of constitutional violations by its officers. *Id.*

Again, the basis of Plaintiff's argument is not clear.  He acknowledges that the Pontiac Police Department had policies proscribing arrests without probable cause and the use of excessive force, as well as policies requiring annual use of force training for officers and identification of officers who use excessive force and/or need additional training in that area.  However, Plaintiff seems to assert that the City's alleged failure to enforce these policies gives rise to supervisory liability under §1983.  Specifically, Plaintiff alleges that: 1) Martinez was not disciplined for past charges of excessive force; 2) the City did not have the requisite system to identify officers in need of additional use of force training; 3) the City did not maintain statistics, in accordance with its policy, regarding use of force; and, 4) the City did not require officers to participate in annual

16

use of force training.

Assuming that it is Plaintiff's contention that these alleged failures are, in themselves, evidence of a policy of inadequate training, Plaintiff's argument fails because there is no evidence to support the premise.  That is, Plaintiff offers no evidence of any of the City's alleged failings.  For instance, Plaintiff failed to show whether Martinez was even found to be culpable for the prior complaints lodged against her.  Consequently, there is also no evidence as to whether she was ever disciplined.  Plaintiff also does not direct the Court to any evidence that the City did not maintain appropriate statistics regarding use of force or that it did not have the requisite system to identify officers in need of additional use of force training.

Lastly, there is no evidence that the City did not require Pontiac police officers to participate in annual use of force training.  In fact, Plaintiff points out that the Pontiac police manual actually directs the Administrative Services Division to provide such training.  *See* Pl. Exh. J at (J)(2)(b).  Plaintiff alleges that Martinez did not participate in annual use of force training.  But, in support of this assertion, he only offers two untitled documents which appear to be computer printouts that purportedly list various training programs that Martinez attended between 1996 and 2004.  Pl. Exh. M.  Even assuming that these documents are sufficient to show that Martinez did not receive annual training, this fact alone is not sufficient to show that the City had a policy or custom of failing to train officers in the use of force.  The Supreme Court has said that the fact that one officer may have been inadequately trained is not enough to establish a failure to train of constitutional proportions:

> That a particular officer may be unsatisfactorily trained will not alone

17

suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had [sic] better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*City of Canton*, 489 U.S. at 390-391 (citations omitted).

In light of the foregoing, the City's motion for summary judgment is granted.

## B.   STATE LAW CLAIMS

Plaintiff concedes that, under M.C.L. §691.1407, the City of Pontiac is immune from intentional tort claims.  And, despite Plaintiff's assertion to the contrary, the Court finds that Chief Gackstetter is immune from tort claims.  It is well settled that, when acting within his executive authority, a police chief holds one of the highest executive positions of city government and, therefore, is absolutely immune from tort liability. *Payton v City of Detroit,* 211 Mich. App. 375, 394 (1995), *app. den.,* 453 Mich. 855 (1996); *Meadows v Detroit,* 164 Mich. App. 418, 426-427 (1987).  Thus, the Court only considers the viability of Plaintiffs' state law claims against the Defendant officers.

### i.   False Arrest and Imprisonment

The Michigan Supreme Court in *Lewis v Farmer Jack Div., Inc*, 415 Mich. 212, 232 (1982), set forth the elements of a false arrest or imprisonment as an arrest or imprisonment:

18

(1) of a person
(2) who is innocent of the charge on which he is arrested
(3) by the defendant or at his instigation
(4) without legal justification.

The test is not whether the arrest was unlawful, but whether there was legal justification, i.e., probable cause, to arrest or detain the plaintiff.  *Id* at 233; *Brewer v Perrin,* 132 Mich. App. 520, 527 (1984).  "Probable cause to arrest is determined by whether or not the 'facts available to the police at the moment of arrest would have justified a fair-minded person of average intelligence and judgment in believing that [the arrestee] had committed a [crime].'"  *Brewer,* 32 Mich. App. at 527 (*quoting People v Goeckerman*, 126 Mich. App. 517, 521 (1983)).

Alicea's testimony raises a question of fact regarding whether there was probable cause for his arrest and imprisonment.  He was charged with disorderly conduct, assaulting an officer, and resisting and obstructing an officer in the discharge of duties.  However, Alicea claims that he actually agreed to and did comply with Martinez's order to leave.  He says that he only stopped, while making his way to an exit, to inquire of another festival-goer about the whereabouts of his son.  He denies striking or touching Martinez in any way, resisting arrest, or otherwise behaving in a disorderly fashion.  Based on this testimony, reasonable jurors could find that there was no legal justification for the Defendant officers to arrest and detain Alicea.  Defendants' motion is denied.

### ii.    Malicious Prosecution

Claims of malicious prosecution are disfavored.  *King v Arbic,* 159 Mich. App. 452, 464 (1987).  To sustain such a claim, a plaintiff must establish the following

19

elements:

> (1) that the defendant has initiated a criminal prosecution against him, (2) that the criminal proceedings terminated in his favor, (3) that the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.

*Matthews v Blue Cross & Blue Shield,* 456 Mich. 365, 378 (1998). When the facts are in dispute, whether a plaintiff has proven a lack of probable cause is a question for a jury. *Pauley v. Hall*, 124 Mich. App. 255, 265 (1983).

It is undisputed that Alicea was acquitted of all charges, which was a termination in his favor. This satisfies the second element. The disputed facts preclude the Court from deciding as a matter of law whether Plaintiff Alicea established the third and fourth elements--lack of probable cause and malice. As stated, there is a question of fact regarding whether Martinez, Hergott and Crampton had probable cause to arrest him. Consequently, there is also a question of fact regarding whether Defendants acted with malice, because "malice may be inferred from want of probable cause." *Weiden v Weiden,* 246 Mich. 347, 352 (1929).

With respect to the first element, Plaintiff must present evidence that the officers initiated a criminal prosecution against him. Although prosecutors ultimately decide whether to initiate and proceed with a prosecution, this element can be met against an officer if there is evidence that the officer knowingly submitted false information that the prosecutor relied on in concluding that there was probable cause. *See King,* 159 Mich. App. at 466; *Matthews,* 456 Mich. at 384-395; *Adams*, 31 F.3d at 388.

Although Plaintiff's burden on this element is relatively minimal, Defendants are

20

correct that it has not been met.  Plaintiff alleges that Defendants acted without probable cause and gave false testimony to the contrary.  However, Plaintiff does not provide any documentary evidence, such as the officer's incident reports, to show what statements were made by each officer and submitted to the prosecutor.  None of the deposition excerpts or other documents attached by Plaintiff provides this information.  Consequently, without documentary or other evidence that the officers made false statements upon which the prosecutor relied in deciding to charge Plaintiff, the Court is obliged to find that Plaintiff failed to establish this necessary element.  Therefore, Defendants Martinez, Hergott and Crampton's motion for summary judgment on this claim is granted.

### iii.    Assault and Battery

"An assault is defined as any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact."  *Espinoza v. Thomas*, 189 Mich. App. 110, 119 (1991); *Smith v Tolberg*, 231 Mich. App. 256, 260 (1998).  "A battery is the wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact."  *Id.*  "Protection of the interest in freedom from unintentional and unpermitted [sic] contacts with the plaintiff's person extends to any part of his body or to anything which is attached to it and practically identified with it."  *Id.*

When an alleged assault and battery arises from an arrest, liability turns on whether the arrest was lawful and, if so, whether the amount of force used was

21

reasonable.  When effecting a lawful arrest, an officer has the right to use the amount of force that is reasonably necessary under the circumstances to effect the arrest.  *Delude v Raasakka*, 391 Mich. 296, 303 (1974); *Tope v Howe*, 179 Mich. App. 91,106 (1989).  "[T]he measure of necessary force is that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary."  *Brewer*, 132 Mich. App. at 528 (*quoting Barrett v United States*, 64 F.2d 148, 149 (D.C. Cir. 1933)(internal quotation marks omitted).  An officer may take reasonable action to protect himself in the course of an arrest or an attempted arrest.  *Delude*, 391 Mich. at 303.

Alicea alleges that his arrest was not lawful.  He offered testimony that, despite the fact that he had not committed any crime or resisted arrest, Martinez struck him and Hergott and Crampton knocked him to the ground.  This testimony is sufficient to raise a question of fact regarding whether Defendants Martinez, Hergott and Crampton committed an assault and battery.

### iv.  Gross Negligence and Governmental Immunity

Michigan's governmental immunity statute provides immunity for governmental employees acting within the scope of their authority, except when the employee's actions amount to gross negligence:

> [E]ach officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if all of the following are met:
>
> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her

22

authority.

 (b) The governmental agency is engaged in the exercise or discharge of a governmental function.

 **(c) The . . . employee's . . . conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.**

M.C.L. §691.1407(2)(emphasis added).  To sustain a claim, a plaintiff must allege substantially more than ordinary negligence.  *Maiden v Rozwood,* 461 Mich. 109, 122 (1999).  And, the requirement that the employee's actions be "the proximate cause" has been interpreted to mean "the one most immediate, efficient, and direct cause preceding an injury."  *Robinson v City of Detroit,* 462 Mich. 439, 459 (2000).

Without specifying the acts to which he is referring, Plaintiff states generally that the officers' conduct amounted to gross negligence.  The only specific argument Plaintiff makes is that Martinez was grossly negligent in arresting him without probable cause and committing the alleged assault and battery.  *Citing Sudul v Hamtramck*[6] and *Smith v Stolberg,*[7] Defendant argues that Plaintiff's claim is defective because, as a matter of law, he "cannot establish gross negligence out of the same facts as his intentional tort claims."  Def. br. at 19.

The Court finds, however, that Defendants' reading of *Sudul* is overly broad and that *Smith* is inapposite.  In *Sudul*, the trial court allowed the jury to consider a claim of "assault and battery by gross negligence," and it found in plaintiff's favor.  The appellate

---

[6]221 Mich. App. 455 (1997).

[7]231 Mich. App. 256 (1998).

23

court vacated the jury's award, finding that such a claim does not exist, and that the trial court inappropriately lowered the burden of proof by allowing jurors to substitute gross negligence for the intent element of assault and battery.

*Smith* did not even involve a gross negligence claim. Rather, the court upheld the lower court's dismissal of a simple negligence claim, where the plaintiff alleged that defendant deliberately pushed him during a court appearance (at which defendant represented the opposing party). Seemingly because this was the primary allegation, the *Smith* Court found that the proper cause of action was for battery, not negligence.

Contrary to Defendants' assertion, the narrow holdings in *Sudul* and *Smith* cannot reasonably be read as prohibiting a plaintiff, under any circumstances, from relying on the same set of facts to establish gross negligence and intentional tort claims. Another court in this district rejected a similar argument with regard to *Sudul*. In *Dubay v Craze*, 327 F.Supp.2d 779, 784 (E.D. Mich. 2004), plaintiff alleged that the defendant officer used excessive force in effecting his arrest, although plaintiff did not resist arrest or otherwise provoke the force used against him. Plaintiff brought state law claims of assault and battery and gross negligence. Relying on *Sudul*, defendant argued that plaintiff could not maintain an action for gross negligence because his allegations sounded in assault and battery, which defendant said could not, by definition, constitute gross negligence because it is an intentional tort. The *Dubay* Court rejected defendant's argument stating:

> This court . . . does not read *Sudul, supra* to say that Plaintiff may not maintain two distinct claims for assault and battery and for gross negligence, but rather finds that *Sudul* stands for the proposition that a court must not conflate the gross negligence analysis into the assault and battery analysis.

24

327 F.Supp.2d at 784.

The Sixth Circuit also rejected the notion that gross negligence and intentional tort claims are mutually exclusive.  In an unpublished opinion the Sixth Circuit in *Campbell v Morrison*,[8] reversed the trial court's grant of a directed verdict on plaintiff's gross negligence claim where plaintiff also brought claims of assault and battery and false arrest.  Plaintiff alleged that he was assaulted and arrested by several officers without cause or provocation.  In dismissing the gross negligence claim, the trial court reasoned that there was no basis for a gross negligence count when plaintiff was proceeding with claims of assault and battery and false arrest.  The Sixth Circuit disagreed stating that, "[c]ontrary to the trial judge's ruling, there is nothing in Michigan law that prohibits bringing a claim of gross negligence as well as a claim of assault and battery."  97 F.3d at *6.  The *Campbell* Court went on to say that "[t]he jury could . . . consider the intentional torts, such as assault and battery, or, alternatively, even if the jury believed Defendants were acting within the scope of their employment in their conduct, it could find the Defendants' conduct negligent where it was 'so reckless as to demonstrate a substantial lack of concern for whether an injury results.'" *Id (quoting Adams,* 31 F.3d at 388).

As in *Dubay* and *Campbell*, this Court declines to find that scenarios where intentional acts are alleged necessarily preclude a plaintiff from also pursuing a claim of gross negligence.  Rather, the Court will consider whether the facts support both types of claims.  In *Smith,* the plaintiff's only apparent allegation was that the defendant

---

[8]97 F.3d 1451 (1996).

25

deliberately pushed him.  However, the factual basis of claims is not always so simple,

particularly in civil rights actions where the facts are often convoluted, disputed, and

based on a number of alleged acts.  Such is the case here, where in addition to the

claim that he was struck by Martinez and others, Plaintiff also alleges that Martinez

ordered him arrested without probable cause, and that the amount of force Hergott and

Crampton used to subdue him was disproportionate to the situation.  Notwithstanding

the alleged intentional assaults, reasonable jurors could also find on these facts that

Martinez's decision to arrest Plaintiff under the circumstances alleged by him and the

manner in which his arrest was allegedly handled by Hergott and Crampton, amounts to

"conduct so reckless as to demonstrate a substantial lack of concern for whether an

injury results" and that Defendants' alleged conduct was the proximate cause of

Plaintiff's alleged injuries.  Therefore, the Court finds that Martinez, Hergott and

Crampton are not entitled, as a matter of law, to governmental immunity against this

claim.

### v.    Intentional Infliction of Emotional Distress

To state a claim for Intentional Infliction of Emotional Distress (IIED), Plaintiffs

must prove: (1) 'extreme and outrageous' conduct;  (2) intent or recklessness;  (3)

causation;  and (4) 'severe emotional distress.' *Roberts v. Auto-Owners Ins. Co.*, 422

Mich. 594, 602 (1985).  Quoting the Restatement, the *Roberts* court described the

element of extreme and outrageous conduct as follows:

> Liability has been found only where the conduct has
> been so outrageous in character, and so extreme in
> degree, as to go beyond all possible bounds of
> decency, and to be regarded as atrocious, and utterly
> intolerable in a civilized community. Generally, the case

26

> is one in which the recitation of the facts to an average
> member of the community would arouse his
> resentment against the actor, and lead him to exclaim,
> 'Outrageous!'

422 Mich. at 603.  Liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Ledsinger v. Burmeister*, 114 Mich. App. 12, 18 (1982)(citing *Warren v June's Mobile Home Village & Sales, Inc*, 66 Mich. App. 386, 390 (1976)).  "Whether a defendant's acts were sufficiently outrageous depends upon the context in which the defendant committed them."  *Bhama v Bhama*, 169 Mich. App. 73, 80 (1988).  For instance, the extreme and outrageous character of a defendant's conduct may arise when a defendant abuses a relationship which puts him in a position of actual or apparent authority over plaintiff or gives the defendant power to affect plaintiff's interests. *Warren,* 66 Mich. App. at 391.

Again quoting the Restatement, the *Roberts* court described the severe emotional distress requirement as follows:

> [Emotional distress] includes all highly unpleasant mental reactions,
> such as fright, horror, grief, shame, humiliation, embarrassment,
> anger, chagrin, disappointment, worry, and nausea. It is only where it
> is extreme that the liability arises. Complete emotional tranquillity is
> seldom attainable in this world, and some degree of transient and
> trivial emotional distress is a part of the price of living among people.
> *The law intervenes only where the distress inflicted is so severe that
> no reasonable man could be expected to endure it. (*emphasis in
> original).

422 Mich. at 609.  Seeking and receiving medical treatment is not a condition precedent to satisfying the element of severe emotional distress.  *McCahill v Commercial Union Ins. Co*, 179 Mich.App. 761, 771 (1989).  However, where a claim is based on emotional injury alone, "more in the way of outrage" may be required.  *Roberts*, 422 Mich. at 609

(citing Restatement Torts, 2d § 46, Comment K, p. 78).

Reasonable minds could differ regarding whether Martinez, Hergott and Crampton's alleged conduct against Alicea was so extreme and outrageous as to go beyond all bounds of decency. However, the Court must disregard the only evidence Alicea offered to establish that he suffered severe emotional distress.

Alicea offers an expert report by psychologist Karen Noelle Clark, Ph.D., in which she diagnoses Alicea with post-traumatic stress disorder. *See* Pl. Exh. R. He also offers Dr. Clark's *unsigned* affidavit to the same effect. *See* Pl. Exh. S. In their Reply, Defendants urge the Court to strike both exhibits because they say that Dr. Clark's evaluation was conducted after discovery ended, and that they did not receive the proper notice. Defendants further contend that Dr. Clark's report and affidavit are complete hearsay.

Because Defendants' request to strike the exhibits was made in their Reply, Plaintiff did not respond. However, the record reveals that discovery closed on February 28, 2005 and expert witnesses were to be identified by June 15, 2004. *See* Amended Scheduling Orders entered August 21, 2004 and January 14, 2005. Dr. Clark's report is dated April 18, 2005 and indicates that she did not examine Alicea until March 25, 2005 and April 1, 2005.

FRCP 26(a)(2)(C) requires that disclosure of proposed experts and their reports "be made at the times and in the sequence directed by the court." When a party fails to make a 26(a) disclosure, the party is not "permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed," unless there is substantial justification for the failure and it is harmless. FRCP 37(c)(1).

28

Here, Plaintiff has not offered *any* justification for failing to timely obtain and disclose Dr. Clark's expert opinion.  The substance of Dr. Clark's report is confined to the incident that occurred three years ago and Alicea's psychological reaction to it.  Consequently, there is no apparent reason why the examination could not have been conducted and properly noticed within the given time constraints.  And, inasmuch as the report is the only evidence offered to establish an essential element of Alicea's IIED claim, and Defendants were not given an opportunity to depose or otherwise challenge the assertions of Dr. Clark, the Court cannot say that Plaintiff's failure to timely obtain an expert opinion and disclose the report is harmless.  Therefore, the Court disregards both the report and affidavit.  Consequently, the Court finds that Plaintiff failed to present evidence on each of the necessary elements of his IIED claim, and Defendants' motion for summary judgment on this claim is granted.

### vi.    Negligent Infliction of Emotional Distress

Although not formally adopted,[9] Michigan courts have recognized a cause of action for negligent infliction of emotional distress.  *Wargelin v Sisters of Mercy Health Corp.,* 149 Mich. App. 75 (1986).  To sustain such a claim, Plaintiffs Jonathan and Alexis must prove:  (1) serious injury threatened or inflicted on a person, not the plaintiff, of a nature to cause severe mental disturbance to the plaintiff, (2) shock by the plaintiff from witnessing the event that results in the plaintiff's actual physical harm, (3) close relationship between the plaintiff and the injured person (parent, child, husband, or

---

[9] *Hesse v Ashland Oil, Inc.,* 466 Mich. 21, 24 n. 6 (2002)(noting that NIED has not been recognized by the Michigan Supreme Court and declining to decide the validity of such an action).

wife), and (4) presence of the plaintiff at the location of the accident at the time the accident occurred or, if not presence, at least shock "fairly contemporaneous" with the accident. *Id* at 81.

Since this cause of action has typically been applied to instances when a parent witnesses the violent death or injury of a child,[10] it is not clear whether Michigan courts would recognize a claim on these facts. However, because Plaintiffs' failed to provide evidence to support a *prima facie* claim, it is not necessary for the Court to decide the question.

First, contrary to Plaintiffs' assertion in their brief, Alexis admitted that he did not witness his father's arrest. He only came along after-the-fact when Alicea was sitting alone in a squad car. Alexis Dep. at pp. 46, 58. Therefore, the first element is not met with respect to Alexis because Alexis did not witness the infliction or threat of a serious injury on his father.

Second, although Jonathan testified that he witnessed the alleged assault upon his father and was upset by it, there is no evidence that the alleged shock that he suffered resulted in "definite and objective physical injury." *Daley v LaCroix*, 384 Mich. 4, 12 (1970). He only testified that he subsequently experienced periodic sadness, anger and a short-term fear of the police. Jonathan Dep. at pp. 38-40. While these emotions may arise from the incident Jonathan witnessed, they are not consistent with the type of physical harm previously found by Michigan courts to satisfy this element. For instance, in *Daley*, the plaintiff met this requirement because she alleged sudden

---

[10]*See Wargelin, supra*; *Gustafson v Faris,* 67 Mich. App. 363 (1976).

loss of weight, inability to perform household duties, and extreme nervousness. 384 Mich. at 15. Likewise, in *Toms v McConnell*, 45 Mich. App. 647, 657 (1973), it was sufficient that plaintiff was unable to function as normal for a period of time and was in a constant state of depression.

Because both Alexis and Jonathan failed to carry their burden on essential elements of their respective claims, Defendants' motion is granted.

## VII.   CONCLUSION

The Court **GRANTS** Defendants' motion in part and **DENIES** it in part. Specifically, the Court will:

1.   Dismiss the Pontiac Police Department;

2.   Dismiss the claims in Counts VII and VIII under the First, Fifth and Fourteenth Amendments;

3.   Deny Defendants Martinez, Hergott and Crampton's motion on Counts I, II, IV, V and VII;

4.   Grant Defendants Martinez, Hergott and Crampton's motion on Counts III, VI and IX; and

5.   Grant Defendants Gackstetter and the City of Pontiac's motion on all Counts.

The only remaining Defendants are Martinez, Hergott and Crampton. The only remaining Plaintiff is Alicea, and his only remaining claims are for false arrest (Count I) and false imprisonment (Count II), assault and battery (Count IV), gross negligence (Count V) and violation of 42 U.S.C. §1983 (Fourth Amendment)(a portion of Count VII).

**IT IS SO ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  August 10, 2005

The undersigned certifies that a copy of this
document was served on the attorneys of
record by electronic means or U.S. Mail on
August 10, 2005.

s/Linda Vertriest
Deputy Clerk

32